IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EDDIE LINDSEY,

    Plaintiff,

  v.

UNITED AIRLINES, INC.,

    Defendant.

No. C 17-00753 WHA

**ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE**

**INTRODUCTION**

In this employment-discrimination action, defendant moves for summary judgment on all of plaintiff's claims. Defendant also moves to strike plaintiff's jury demand as to the ERISA Section 510 claims. For the reasons below, the motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. The motion to strike is **GRANTED**.

**STATEMENT**

Plaintiff Eddie Lindsey is an African-American airline captain employed by defendant United Airlines, Inc. He began working for United's predecessor, Continental Airlines, in 1979. As a "line pilot" for the majority of his career, Lindsey flew defined trips on an assigned aircraft (Lindsey Exh. 1; Fulmore Decl. ¶ 3).

For clarity, this order now sets forth an earlier chapter of litigation between the parties, a chapter not actually pled in the first two complaints filed in this action, but which Lindsey now seeks to renew.

In 2008, Continental terminated Lindsey for his alleged participation in a "sham" divorce. The company accused Lindsey and his wife of divorcing — only to remarry the following year — for the specific purpose of obtaining a domestic relations order assigning Lindsey's pension plan to his wife and allowing her to receive his pension in a lump sum prior to his retirement. Continental then sued Lindsey (among other pilots) to recoup pension plan benefits purportedly distributed pursuant to such sham divorces. After Lindsey filed an EEOC charge, he and others counter-sued Continental for retaliation. The pension lawsuit received press coverage across the country, including in the *New York Times* and *Houston Chronicle.* One *Houston Chronicle* article featured Lindsey as one of the pilots sued by Continental in the pension litigation (E. Cormican Dep. 12:8–16; Lindsey Exhs. 7–8, 10, 13).

Ultimately, the United States Court of Appeals for the Fifth Circuit upheld dismissal of Continental's lawsuit, narrowly holding that ERISA's anti-alienation provision did not authorize the retirement plan administrator to consider or investigate the subjective intentions or good faith underlying a divorce. *Brown v. Cont'l Airlines, Inc.*, 647 F.3d 221 (5th Cir. 2011). No court has determined whether or not Lindsey's divorce was in bad faith.

Lindsey and Continental settled their respective claims in 2012. Continental paid Lindsey a cash settlement and agreed to reinstate him as a pilot. Continental also agreed to remove certain materials from Lindsey's personnel file:

> Except as required by [the Pilot Records Improvement Act of 1996], which the parties agree requires, without limitation, [Continental's] retention of this Agreement and a record of the dates of Eddie Lindsey's termination and reinstatement in Eddie Lindsey's P12 file, all materials related to the Lindseys' divorce, [qualified domestic relations order], termination, or the Dispute will be removed from Eddie Lindsey's personnel file, including his P10, P11, and P12 files.

By the time the pension lawsuit resolved, Continental had merged with United. Despite the terms of the settlement agreement, materials related to Lindsey's termination remained in his personnel file at United (Lindsey Exhs. 15, 19–20).[1]

---

[1] On reply, United summarily argues that keeping these materials in Lindsey's P12 file did not violate the parties' settlement agreement because the agreement authorized United to retain documents as required under the Pilot Records Improvement Act of 1996.

2

After Lindsey's reinstatement at United, he applied to three line check airman, or "check airman," positions in Houston, Texas — two in 2014 and one in 2015. Lindsey's claims in this case stem in part from United's failure to select him for the 2015 check airman position.

Check airman jobs were considered quasi-management positions. Check airmen maintained United's flight standards by flying with new pilots to ensure proper implementation of training and by performing "line checks" or in-flight evaluations of line pilots (Cormican Decl. ¶¶ 6–8).

After receiving a check airman application, United screened the applicant to ensure he possessed a minimum number of required flight hours. United's flight operations manual also directed the hiring team to review the applicant's personnel file. If selected, a three-person panel interviewed the applicant using a standardized scoring guide. Panel members independently scored the candidate in multiple categories on a scale of 1 to 5 and after the interview came to a collaborative score for each category. A collaborative score of "2" or less in any category usually resulted in a candidate not advancing past the interview. Candidates who did advance entered a training and qualification process (Fulmore Decl. ¶¶ 8–18; Lindsey Exh. 21).

Lindsey interviewed for a check airman job at United in April 2014. Rich Fulmore — an HR manager who had worked at Continental and helped investigate the "sham divorces" central to the pension lawsuit — interviewed Lindsey with two other panelists. Lindsey did not get the job. According to Fulmore, the panel did not select him because Lindsey interviewed poorly, did not wear professional attire, and failed to demonstrate the communication skills required for the job. Lindsey did not accept Fulmore's invitation to discuss his performance in the interview. He later filed a claim with the EEOC, asserting that United did not select him because of his age, race, and involvement in the pension litigation (Fulmore Decl. ¶¶ 21–22; Fulmore Dep. 43:9–45:25; Lindsey Dep. 201:24–25; Lindsey Exh. 25).

Lindsey next interviewed for a check airman position in October 2014. Fulmore again conducted the interview with two other panelists. As reflected on United's privilege log, around the date of the interview, Fulmore sent and received several emails to and from Sheila

3

Frederick, United's in-house counsel. The panel did not select Lindsey, citing the same reasons he did not get the job in April — he interviewed poorly, did not wear professional attire, and failed to demonstrate the communication skills required for the job (Fulmore Decl. ¶ 23; Lindsey Exh. 29). The foregoing interviews are not sued on in this action and provide background facts only.

In August 2015, Lindsey attended his third check airman interview. The interview panel consisted of Fulmore, Captain Kyle Gardner and Captain Jay Cormican. Again citing to United's privilege log, Lindsey notes that on the day of his interview, all three panelists were on an email that included Attorney Frederick. Lindsey finds this communication suspect in light of witness testimony that HR does not regularly consult with United's legal department during the interview process (Simons Dep. 133:17–134:16; Heigl Dep. 33:1–4; Lindsey Exh. 29).

During the interview, Fulmore independently rated Lindsey a "2" in two interview categories. Fulmore, who is African American, says that race did not play a role in his decision-making process. He does not dispute that he knew of Lindsey's involvement in the pension litigation at the time of the interview, but states that he did not consider the existence of or Lindsey's participation in any lawsuit in deciding not to promote Lindsey (Fulmore Decl. ¶¶ 41–44; Fulmore Dep. 46:8–25).

Captain Cormican independently rated Lindsey a "2" in three interview categories. Cormican says he had a general familiarity with the pension litigation at the time of Lindsey's interview, but that he did not learn of Lindsey's involvement in the lawsuit, or of Lindsey's EEOC claim, until after the interview. Captain Clarence Williams, however, testified otherwise. According to him, which this order must credit on summary judgment, Captain Cormican discussed Lindsey's involvement in the pension lawsuit at a dinner party that took place prior to the interview, telling Captain Williams that he "could not hire a guy who defrauded the company" and that Lindsey was unfit as a check airman. Captain Cormican could not recall at his deposition whether he had ever made such statements to Captain Williams (Cormican Decl. ¶¶ 35–38; Williams Dep. 147:6–150:6; Cormican Dep. 97:7–98:1).

4

Captain Gardner, the third interviewer for the 2015 check airman position, independently rated Lindsey a "3" or higher in each interview category. Following the interview, the panel reviewed their individual scores and collaboratively determined that Lindsey scored a "2" in two interview categories. Although Lindsey remained one of the most senior pilots flying for United, and although United concedes that Lindsey met the minimum qualifications for the position, the panel unanimously decided not to promote him (Lindsey Exhs. 6, 22, 34; Fulmore Decl. ¶ 34).

The only other candidate to apply for the job, Captain William Bella, passed the interview and entered United's training program. In comparison to the thousand hours Lindsey had logged on the aircraft, Captain Bella, who is white, had logged only 217 hours. Captain Bella ultimately did not succeed in the training program and United determined that he needed more experience on the aircraft (Cormican Dep. 23:21–24:13; Lindsey Exhs. 32, 35, 38).

After this third rejection, Lindsey filed an EEOC charge. He alleged that United's repeated refusal to promote him was due to discrimination based on his age and race. He also raised the possibility that United's refusal to promote him was "punishment" for his involvement in the pension lawsuit (Lindsey Exhs. 41–42).

In November 2015, Captain Cormican's wife, Captain Evey Cormican, wrote to the Chief Pilot for United's Houston base. In that email, Captain Evey Cormican said: "[Lindsey] has a history, he was fired for approximately 7 years. He was one of the ring leaders in the divorce fiasco. Currently suing Jay for age discrimination for not making him [a check airman]" (Lindsey Exh. 44).

Also in November 2015, Lindsey applied for the assistant-chief-pilot position in San Francisco. This is the second promotion at issue in this case. All line pilots were assigned to a particular base, located at one of eight airports nationwide. Each base had a chief pilot who oversaw base operations and an assistant chief pilot who acted as second-in-command. United conceded that Lindsey met the minimum qualifications for the assistant-chief-pilot job (Ellis Decl. ¶¶ 3–6; Lindsey Exhs. 33, 46).

Captain Lawrence Ellis, United's chief pilot in San Francisco, was the hiring manager for the position. Kaisa Heigl, an HR manager, facilitated the hiring process by scheduling and sitting in on interviews. Captain Ellis received eight applications for the assistant-chief-pilot position and selected three for interviews. On December 10, while Heigl was in the process of scheduling those interviews, Captain Ellis explained to Heigl that he wanted a candidate with leadership experience, such as in the military or with the pilot's union. Captain Ellis asked Hiegl to schedule a fourth interview using that criteria (Ellis Decl. ¶¶ 7–18).

On December 11, Heigl sent Captain Ellis an email with the subject line "Eddie Lindsey." In that email, Heigl asked Captain Ellis to review Lindsey's resume and noted that she did not see any management or military experience. Heigl also described Lindsey as "the one who has [a] lawsuit per [Attorney Frederick]." The next day, Captain Ellis emailed Heigl and told her that he "[did]n't see enough managerial experience in military or commercial airline for [Eddie] Lindsey to warrant an interview." Captain Ellis does not remember whether he noticed Heigl's comment regarding the lawsuit when he read her email, but says that it played no role in who he selected. Captain Ellis, who is African American, also states that race did not play a role in his decision (Lindsey Exhs. 47, 51; Ellis Decl. ¶¶ 19–29).

Captain Ellis ultimately hired Captain Stanley Snow, who is not African American, for the assistant-chief-pilot job. While Captain Snow had a military-leadership background, he had less flying experience than Lindsey (Ellis Decl. ¶ 13; Lindsey Exh. 6).

Lindsey commenced this action in February 2017. He originally alleged claims for race and age discrimination under (1) Title VII of the Civil Rights Act, (2) 42 U.S.C. § 1981, (3) the Age Discrimination in Employment Act, (4) the California Fair Employment and Housing Act, (5) the Texas Commission on Human Rights Act (TCHRA), and (6) 42 U.S.C. § 1985. Lindsey later amended the complaint to include allegations that he was retaliated against for filing complaints with the EEOC.

Pursuant to the parties' stipulation, Lindsey filed a second amended complaint in February 2018. The second amended complaint dropped his claims for age discrimination and added claims for discrimination and retaliation in violation of ERISA Section 510. United now

6

moves for summary judgment on all of Lindsey's claims and moves to strike Lindsey's jury demand as to the ERISA Section 510 claims (Dkt. Nos. 1, 29, 85, 94, 99). This order follows full briefing and oral argument.[2]

**ANALYSIS**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is "a high standard for the granting of summary judgment in employment discrimination cases." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). Our court of appeals "require[s] very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry — one that is most appropriately conducted by the factfinder, upon a full record." *Ibid.* (quotations and citations omitted).

1. **ERISA SECTION 510 CLAIMS.**

The parties agree that Lindsey's ERISA Section 510 claims — asserted for the first time in the second amended complaint dated February 16, 2018 — must meet the two-year statute of limitations. The parties further agree that the statute of limitations began to run when Lindsey learned that he was not selected for the check airman and assistant-chief-pilot positions. *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1140–41 (7th Cir. 1992).

With respect to the check airman position, it is undisputed Lindsey knew by August 2015 that the interview panel had not selected him for the job. Because Lindsey did not raise his Section 510 claims until February 2018, and because these claims do not relate back to Lindsey's prior complaints, his Section 510 claims arising from the check airman position are time-barred.

FRCP 15(c) provides that an amendment relates back to the date of the original pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or

---

[2] Lindsey does not dispute that he is not entitled to a jury trial on his ERISA Section 510 claims because those claims are equitable in nature. United's motion to strike Lindsey's jury demand as to his Section 510 claims is accordingly **GRANTED**.

7

occurrence set out — or attempted to be set out — in the original pleading." To relate back, the original and amended pleadings must share a common core of operative facts so that the adverse party has fair notice of the transaction, occurrence, or conduct called into question. *Martell v. Trilogy Ltd.*, 872 F.2d 322, 325 (9th Cir. 1989).[3]

Lindsey argues that his Section 510 claims relate back because they "will likely be proved by the 'same kind of evidence' offered in support of the original pleading." *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) (citation omitted). It may be true that Lindsey would prove his Section 510 claims through the same witnesses and many of the same documents as he will use to prove his race-discrimination and retaliation claims. But proof of the Section 510 claims will require evidence of a whole new theater of facts entirely unmentioned in the prior complaints — namely that in 2005 Lindsey engaged in conduct protected by ERISA and that these protected activities impacted United's hiring decisions in 2015. Accordingly, even if the same witnesses did testify as to both sets of claims, the testimony elicited from those witnesses as to the Section 510 claims would necessarily span events occurring a decade prior to the alleged discriminatory and retaliatory conduct otherwise at issue in this case.

Moreover, *ASARCO* recognized that "[f]airness to the defendant demands that the defendant be able to anticipate claims that might follow from the facts alleged by the plaintiff" and that "notice is an essential element in the relation back determination." 765 F.3d at 1005–06 (citation omitted). Here, Lindsey's prior complaints did not put United on notice of his Section 510 claims. That all versions of the complaint involved the same two promotions is insufficient. In describing Lindsey's employment history, the prior complaints alleged only that he "left" Continental around 2008 and "returned" to United in 2012, with no mention of Lindsey's "sham divorce," his termination, or the pension litigation. The lone allegation that United retaliated against Lindsey for exercising "federally protected rights," while at the same time explicitly alleging retaliation for Lindsey's EEOC charges, did not put United on notice of

---

[3] This order declines Lindsey's invitation to apply Texas law in determining whether his federal claims relate back to the original complaint. Lindsey cites no authority suggesting that the application of Texas law would be appropriate.

8

Lindsey's theory that he did not receive the check airman position due to United's incorrect belief that "Lindsey entered into a 'sham divorce' to defraud its predecessor" (Second Amd. Compl. ¶ 38).

Our court of appeals' decision in *Williams v. Boeing Co.*, 517 F.3d 1120 (9th Cir. 2008), is instructive. There, the plaintiffs' compensation discrimination claim did not relate back to an earlier complaint for promotion discrimination, hostile work environment, and retaliation. *Williams* held that general allegations that the defendants discriminated against the plaintiffs with regard to "terms of employment" did not provide fair notice of the compensation discrimination claim where the plaintiffs' earlier complaints did not sufficiently allege salary inequities. *Id.* at 1131. Because the amended complaint had to include additional facts to support the compensation discrimination claim, and different evidence would be used to prove the claim, the claim was a "new legal theory depending on different facts, not a new legal theory depending on the same facts." *Id.* at 1133. So too here.[4]

Lindsey's remaining arguments similarly lack merit. He suggests that he could not see "the extent" of the Section 510 violations until United's August 2017 document production, yet, notably, his 2015 EEOC complaint had already explicitly raised his concern that United refused to promote him to the check airman position as "punishment" for the pension lawsuit. Lindsey fails to otherwise demonstrate that United prevented him from timely filing his Section 510 claims.

Had Lindsey met the statute of limitations, these claims would have likely survived summary judgment. Among other things, Lindsey points to evidence that at least one member of his interview panel knew of Lindsey's involvement in the pension litigation and refused to promote him on that basis. Nonetheless, for the reasons explained, this order must dismiss as time-barred those Section 510 claims related to the check airman position. Summary

---

[4] Lindsey's other authorities are inapposite. In *Santana v. Holiday Inns, Inc.*, 686 F.2d 736 (9th Cir. 1982), the plaintiff's interference with employment relations claim related back to the original pleading which alleged that the plaintiff had been terminated from her job as a result of the defendant's conduct. And in *Richardson v. HRHH Gaming Senior Mess, LLC*, 99 F. Supp. 3d 1267 (D. Nev. 2015) (Judge Gloria M. Navarro), the plaintiff's claims for defamation and negligent supervision related back to the original race discrimination complaint because the facts alleged in the original complaint "raised an inference" that the defendant had made false claims about the plaintiff and failed to properly supervise a biased employee.

9

adjudication on this issue is accordingly **GRANTED**.

With respect to the assistant-chief-pilot position, however, United has not met its burden of demonstrating that the statute of limitations on Lindsey's Section 510 claims has run. United points only to Lindsey's deposition testimony in which he states that he learned "around January" 2016 that he would not receive the assistant-chief-pilot position. This language is not precise enough to rule out the possibility on summary judgment that the February 2018 amendment was timely, though at trial it might well be found untimely.

Moreover, Lindsey has sufficiently shown pretext. For example, in HR Manager Heigl's email to Captain Ellis she refers to Lindsey as "the one who has lawsuit" when she asks Captain Ellis to review Lindsey's resume. Heigl testified that she could only "speculate" by what she meant by her reference to a "lawsuit" (Heigl Dep. 20:1–22). A reasonable factfinder could infer from this evidence that Lindsey's involvement with the pension litigation was the true reason he was not selected for an interview. While mere knowledge of protected activity may not always be substantial evidence of pretext, *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007), Lindsey has shown more than that. Captain Ellis denied Lindsey an interview within a day of and in response to Heigl's email describing Lindsey as "the one with lawsuit." United points to Captain Ellis's declaration in which he states that he does not remember whether he even noticed Heigl's comment when he read her email. This is a credibility argument that must be made to the factfinder. United's motion for summary judgment on Lindsey's ERISA Section 510 claims is accordingly **DENIED**.

At trial, the issue of whether the statute of limitations has run will be a question for the undersigned judge to decide. During the trial to the jury, both sides shall include their evidence on when Lindsey learned that he had not received the assistant-chief-pilot position. While the jury deliberates on Lindsey's race discrimination and retaliation claims, the undersigned judge will determine whether the statute of limitations bars the remainder of Lindsey's Section 510 claims. If it is determined that Lindsey's Section 510 claims are not barred by the statute of limitations, the parties will be permitted to supplement the record through a later bench trial on the merits of those claims.

### 2. RACE-DISCRIMINATION CLAIMS.

Evidence of discrimination may be direct or circumstantial. Where, as here, direct evidence of the employer's discriminatory intent is lacking, a plaintiff must raise an inference of discrimination through the three-step burden-shifting framework first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The steps are: (1) the plaintiff must establish a prima facie case of employment discrimination; (2) the employer must offer legitimate, nondiscriminatory reasons for its actions; and (3) the plaintiff must prove that these reasons were a pretext to mask an illegal motive. *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123–24 (9th Cir. 2000).

United does not dispute Lindsey's prima facie case of discrimination. Nor does Lindsey dispute that United has articulated legitimate, nondiscriminatory reasons for United's refusal to promote Lindsey to the check airman and assistant-chief-pilot positions. The parties only dispute whether United's proffered reasons — Lindsey's poor communication skills during the interview and a lack of relevant leadership experience — were merely pretext to mask United's discriminatory animus.

A plaintiff can prove pretext in two ways. *Noyes v. Kelly Services*, 488 F.3d 1163, 1170 (9th Cir. 2007). Pretext can be proven directly, by showing that unlawful discrimination more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is "unworthy of credence." *Ibid.* All of the evidence as to pretext — whether direct or indirect — should be considered cumulatively. Where the evidence of pretext is circumstantial rather than direct, the plaintiff must present "specific" and "substantial" facts showing that there is a genuine issue for trial. *Ibid.* That requirement is tempered, however, by the observation that "the burden on plaintiffs to raise a triable issue of fact as to pretext is 'hardly an onerous one.'" *Ibid.* (citation omitted). In addition, courts "must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008).

11

### A. Check Airman Position.

Lindsey has produced evidence that the panel's articulated reason for not promoting him was pretextual. As an initial matter, "[t]he evaluation of a pilot's communication and cooperation skills requires a subjective evaluation of the pilot's attitude, manner, tone, and other similar traits — evaluations that are inherently subjective." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1123–24 (9th Cir. 2009). Our court of appeals has cautioned that the use of such subjective criteria in hiring is "particularly susceptible to discriminatory abuse and should be closely scrutinized." *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995) (citation omitted).

Lindsey's expert, Captain Gregory Bowen, testified that he disagreed strongly with the panel's determination that Lindsey lacked the communication skills necessary to be a check airman. Captain Bowen explained that his evaluation was based on (1) Lindsey's successful interviews with three different airlines during Lindsey's absence from United, (2) Lindsey's ability to respond to Captain Bowen's technical questions regarding maneuvers on the aircraft, and (3) a review of Lindsey's deposition transcripts (Bowen Dep. 99:19–101:16). This positive evaluation of Lindsey's communication skills undermines the credibility of the panel's determination, or so a reasonable jury could find. Moreover, in addition to Lindsey having previously worked as a check airman at Continental between 1988 and 1990, Captain O'Hagan testified that, based on his experience flying with Lindsey, Lindsey demonstrated leadership skills and interacted well with the crew (O'Hagan Dep. 9:15–10:17). At the time of the check airman interview, Lindsey had over a thousand hours of flying experience and remained one of the most senior pilots at United. Despite these qualifications, United selected a white pilot with only 17 flight hours above the 200-hour minimum to proceed past the interview. United later determined that this same white pilot lacked sufficient flying experience and needed more time on the aircraft. Considering the evidence cumulatively — and drawing all inferences in Lindsey's favor — there is a genuine dispute of material fact regarding pretext.

United disagrees that this demonstrates pretext, arguing that witnesses' opinions as to how Lindsey communicated in *other* circumstances are insufficient to demonstrate pretext.

12

Contrary to United, our court of appeals has recognized that "[a]lthough subjective evaluations of an employee's skills of course may differ for a variety of reasons," coworkers' assessments of an employee's performance can be clearly probative of pretext. *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1051 (9th Cir. 2009).

United's non-binding authorities on this point are distinguishable. In *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253 (11th Cir. 2010), evidence that the plaintiff performed her job well did not raise a genuine issue of pretext where the two men to hold the position before her were of different ethnic backgrounds and were also fired for failing to meet the "very high expectations" of the defendant's CFO. And in *Carter v. George Washington Univ.*, 387 F.3d 872, 880 (D.C. Cir. 2004), the plaintiff failed to rebut the defendant's explanation that she was not selected for a promotion because of her poor interviewing skills where the evidence offered was a "single positive description" of the plaintiff's behavior during a different job interview. Here, additional evidence supports Lindsey's pretext argument.

During the hearing on United's motion, United suggested that summary judgment is required unless Lindsey shows *both* that United's proffered reason for not promoting him was false *and* that discrimination was the real reason for the decision. To the contrary, our court of appeals has been clear that once a plaintiff undermines the credibility of the defendant's stated reasons for an employment decision, "the question of whether the 'real reason' for the promotion decision was unlawful discrimination should [go] to the jury." *Noyes*, 488 F.3d at 1172.

United's misstatement of Lindsey's burden of summary judgment is also not supported by *Giles v. Transit Employees Fed. Credit Union*, 794 F.3d 1 (D.C. Cir. 2015), the out-of-circuit decision on which United relies. That decision recognized that courts "do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment." *Id.* at 13. Indeed, *Giles* cites to *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000), where the Supreme Court explained:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is

13

> dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Id.* at 147–48. While *Reeves* explained that such a showing may not *always* be adequate, including when "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," *Id.* at 148, such circumstances are not present here. Summary judgment on Lindsey's race discrimination claims is accordingly **DENIED**.

### B. Assistant Chief Pilot Position.

Lindsey fails to show, however, that United's proffered reason for denying him an interview for the assistant-chief-pilot position was pretext to mask discriminatory animus.

Lindsey first argues that United's explanation is "unworthy of credence" because his resume *does* reflect relevant leadership skills. He points to the following facts: (1) Captain Gardner testified that being a captain is "by definition" a leadership position and an applicant's flight hours are relevant in evaluating leadership; (2) during Lindsey's 2015 check airman interview he received a passing score in the "leadership disposition" category; (3) Captain O'Hagan testified that Lindsey was a "good leader" on the aircraft; (4) Lindsey had served as a check airman for Continental in 1988, which United considers a "quasi-leadership" role; and (5) United conceded that Lindsey met the minimum qualifications for the assistant-chief-pilot position, which included "experience leading and influencing a team." This is insufficient to undermine Captain Ellis's stated reason for not interviewing Lindsey — that Captain Ellis was looking for a candidate who had demonstrated experience leading pilot populations in a United flight office, in the military, or in the pilot's union.

Lindsey next seeks to undermine Captain Ellis's credibility by pointing to inconsistencies between Captain Ellis's deposition testimony and the declaration he submitted in support of United's motion for summary judgment. In particular, while Captain Ellis

testified that he had not been aware that Lindsey was involved in the pension litigation or had filed a discrimination compliant, Lindsey learned after the deposition that Captain Ellis had received an email from Heigl in which Heigl referred to Lindsey as "the one who has [a] lawsuit." In Captain Ellis's declaration, he now explains that at the time he received Heigl's communication, he "had no idea about existence of, let alone the nature of, any 'lawsuit'" filed by Lindsey, and has no recollection of whether he even noticed that comment at the time he read the email. Whatever relevance this may have to Lindsey's retaliation claims, he fails to explain how it demonstrates pretext of *race* discrimination. It is undisputed that Captain Ellis had never met Lindsey and did not know that Lindsey was African American. Because there is no genuine issue that Captain Ellis was unaware of Lindsey's race when he reviewed Lindsey's application, summary adjudication is appropriate. *Robinson v. Adams*, 847 F.2d 1315, 1317 (9th Cir. 1987).

Seeking to avoid this result, Lindsey argues that it was Attorney Frederick, not Captain Ellis, who was the decisionmaker for the assistant-chief-pilot position. In support, Lindsey relies on a single email sent over a month after Captain Ellis selected Captain Snow for the assistant-chief-pilot position. That email — which does not reference Lindsey or Captain Ellis — consists of a United employee asking: "Did [Attorney Frederick] approve this one? — Assist Chief Pilot for SFO" (Lindsey Exh. 55). Speculation that Captain Ellis was not the sole decisionmaker on whether to interview applicants for the assistant-chief-pilot position gets Lindsey no further on summary judgment. Summary adjudication on this issue is accordingly **GRANTED**.

### 3. RACE-BASED RETALIATION CLAIMS.

A plaintiff establishes a prima facie case of retaliation by showing: (1) he engaged in protected activity; (2) the defendant subjected him to an adverse employment decision; and (3) there was a causal link between the protected activity and the defendant's action. *Johnston v. Horne*, 875 F.2d 1415, 1421 (9th Cir. 1989), *overruled on other grounds as recognized by Williams-Scaife v. Dept. of Defense Dependent Schs.*, 925 F.2d 346, 348 (9th Cir. 1991). Once the plaintiff establishes a prima facie case of retaliation, "the burden of production shifts to the

defendant to articulate a legitimate, non-retaliatory explanation for the adverse employment action." *Winarto v. Toshiba Am. Elec. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001). If the employer rebuts the inference of retaliation, the burden then shifts back to the plaintiff to show that the defendant's explanation is merely a pretext for impermissible retaliation. *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1115 (9th Cir. 2003).

Lindsey fails to set forth a prima facie case of retaliation as to the check airman position because he does not provide sufficient evidence of causation. To make out a prime facie case "the plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003). Lindsey had filed two EEOC charges by the time of the check airman interview — one in 2008 and another in August 2014. Although Lindsey points to evidence that Fulmore and Captain Cormican knew of Lindsey's involvement with the pension litigation at the time of the interview, he points to no evidence that any member of the panel knew of the EEOC charges. Summary adjudication of this issue is **GRANTED**.

With respect to the assistant-chief-pilot position, however, Lindsey has raised a genuine dispute. As with Lindsey's Section 510 claims, HR Manager Heigl's email to Captain Ellis referring to Lindsey as "the one who has lawsuit" creates a triable issue regarding pretext. United acknowledges that Heigl's reference to a "lawsuit" was made when Lindsey had an EEOC charge. A reasonable juror could accordingly infer that Lindsey's EEOC claim was the true reason he was not selected for an interview. Summary judgment on Lindsey's race-retaliation claims is **DENIED**.

4. **EVIDENTIARY OBJECTIONS.**

This order now addresses the parties' evidentiary objections. *First*, United objects to Lindsey's Exhibit 20 and Exhibit 52, two letters of recommendation, as unauthenticated hearsay. Exhibit 20 is part of the personnel file produced by United in this litigation. It is therefore deemed authenticated when offered by a party opponent. *Orr v. Bank of America*, 285 F.3d 764, 777 n.20 (9th Cir. 2002). While the letter is hearsay to prove Lindsey's

16

communication skills, it is admissible to show that United was on notice of a coworker's belief that Lindsey performed well as a check airman. United's objections to Exhibit 20 are accordingly **OVERRULED**.

The letter appended as Exhibit 52 was not produced by United in discovery. Nor does Lindsey include an affidavit or declaration from the author of the letter or similar authenticating witness. The document is not properly authenticated and United's objection to Exhibit 52 is **SUSTAINED**.

*Second*, United objects to the deposition testimony of Lindsey's expert Captain Gregory Bowen on the ground that Captain Bowen "merely parrot[s] the conclusions of Lindsey's counsel." United then attaches and refers to its forthcoming motion in limine. United's attempt to incorporate evidentiary objections by reference violates Local Rule 7-3(c), which requires evidentiary objections to be contained within the reply brief or memorandum. The objection is accordingly **OVERRULED**.

United also objects to Captain O'Hagan's testimony as irrelevant and a "general lay opinion." O'Hagan's observations as to Lindsey's interactions with coworkers in the cockpit are relevant to Lindsey's qualifications for the check airman position. United's objection is **OVERRULED**.

*Third*, United objects to evidence that Lindsey cites in arguing that United's hiring managers do not routinely consult with lawyers. Not only does United fail to specify the evidence to which it objects, it fails to identify the grounds on which it believes the evidence is inadmissible. The objection is **OVERRULED**.

*Fourth*, United's objection to Exhibit 12, an article from the *Houston Chronicle*, is **OVERRULED**. The article is not offered to show the truth of the matter asserted.

*Fifth*, United objects to the audio recording of John Weigand, the managing director of flight standards at United, on the grounds that the recording is hearsay, not authenticated, and has "chain-of-custody issues." This order does not consider United's motion in limine concerning the admissibility of the recording, which United appends to its reply in violation of Local Rule 7-3(c). Nonetheless, the Court's has reviewed the recording and this order finds that

the recording does not create a fact issue every time a United witness claimed he did not know something during a deposition. Because this order does not rely on the recording, it need not reach United's evidentiary objections.

Lindsey raises two objections. *First*, he asks the Court to disregard all of United's reply evidence on the ground that it should have been raised in United's opening papers. Reply declarations are disfavored. This is a worthwhile point but in the circumstances of this case will be **OVERRULED**. Lindsey had the opportunity to file evidentiary objections and address any new arguments at the hearing on United's motion.

*Second*, Lindsey objects to Exhibits I, N, O, and P — consisting of two unfiled motions and two emails written by United's counsel — as inadmissible hearsay. This order does not rely on those exhibits and accordingly need not reach Lindsey's objections.

**CONCLUSION**

For the reasons stated above, United's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. United's motion to strike is **GRANTED**.

**IT IS SO ORDERED.**

Dated: May 11, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE